UNITED STATES v. BAKER.

(District Court, S. D. Texas, at Houston. November 10, 1919.)

No. 229.

1. MASTER AND SERVANT ⬳13—HOURS OF SERVICE ACT; "CONTINUOUSLY OPERATED NIGHT AND DAY STATION."

Where telegraphic train dispatch service is maintained by a railroad company at a station continuously during the 24 hours, the fact that during the nighttime the messages are by arrangement handled by operators of another company does not prevent the station from being a "continuously operated night and day station" within Hours of Service Act, § 2 (Comp. St. § 8678), where operators may not, without violation of the act, be kept on duty more than 9 hours in any 24-hour period.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Continuously Operated.]

2. MASTER AND SERVANT ⬳13—HOURS OF SERVICE ACT LIBERALLY CONSTRUED.

The Hours of Service Act (Comp. St. §§ 8677–8680) is highly remedial, and should be liberally construed, and the fact that a penalty is provided for its violation does not change the rule.

3. MASTER AND SERVANT ⬳13—INTENT IMMATERIAL IN PROSECUTION FOR VIOLATION OF HOURS OF SERVICE ACT.

The fact alone of violation of the Hours of Service Act (Comp. St. §§ 8677–8680) subjects the offending company to the prescribed penalty, and an unlawful intent is not necessary.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

At Law. Action for penalties by the United States against James A. Baker, Receiver of the International & Great Northern Railway. Judgment for the United States.

D. E. Simmons, U. S. Atty., of Houston, Tex., and Monroe C. List. Sp. Asst. U. S. Atty., of Washington, D. C.

Wm. H. Wilson, of Houston, Tex., for defendant.

HUTCHESON, District Judge. This is a suit by the United States for penalties for violation of that portion of section 2 of the federal Hours of Service Act (Act March 4, 1907, c. 2939, 34 Stat. 1415 [section 8678, United States Compiled Statutes]), which reads as follows:

"That no operator, train dispatcher, or other employé who by the use of the telegraph or telephone dispatches, reports, transmits, receives, or delivers orders pertaining to or affecting train movements shall be required or permitted to be or remain on duty for a longer period than nine hours in any twenty-four hour period in all towers, offices, places, and stations continuously operated night and day, nor for a longer period than thirteen hours in all towers, offices, places, and stations operated only during the day-time, except in case of emergency, when the employés named in this proviso may be permitted to be and remain on duty for four additional hours in a twenty-four hour period on not exceeding three days in any week"

—the government alleging in 10 counts that the defendant, during the 24-hour period beginning at the hour of 7 o'clock a. m. to the hour of 6 o'clock p. m., at its office and station at Navasota, Tex., required and permitted its telegrapher, M. Menger, to be and remain on duty for a longer period than 9 hours in said 24-hour period. The defendant denies the violation of the act, claiming that the station or place was a daytime station only.

[1] The cause was submitted upon the pleadings and an agreed statement of facts, which statement is on file with the clerk, and is referred to as a part hereof, and is contained in a note attached hereto. This statement, with exhibits attached, shows: That under a contract between the Houston & Texas Central Railroad Company and the receiver it was provided that between the hours of 6 p. m. and 6 a. m. the Central Company should furnish the International Company telegraphic service at the price of $50 per month; that this service was performed by operatives employed and paid by the Central Railroad, the receiver having no jurisdiction, control, or authority over them, but dealing directly with the company. That from 7 a. m. to 6 p. m. M. Menger, a telegraph operator employed by the receiver, acted as telegrapher. When he went off duty, no telegraphic service whatever was carried on in the I. & G. N. station building, until he returned at 7 a. m. All train orders issued between 6 p. m. and 6 a. m. for the movement of trains over defendant's line of railroad were issued by defendant's chief train dispatcher located at Mart, Tex., and transmitted over the telegraph to the H. & T. C. operator on duty in the H. & T. C.-Santa Fé tower, who delivered same to the crews of the receiver's trains to whom they were directed. When Menger had orders for trains which failed to arrive by 7 p. m., he would carry these orders to the H. & T. C. operator, who would

sign for same in the defendant's transfer book, and thereafter deliver it to the proper train crew. Each morning, before Menger went on duty, he would telephone the tower to see if any train orders were undelivered, and, if so, would go after them and sign for same in the transfer book, thereafter delivering same from the station in the usual manner.

As stated by the government in its brief, the determination of this case involves but a single question: Was the Navasota office one, or was Navasota a place, continuously operated day and night, or was it an office or place operated only during the daytime? The question of whether or not the defendant had any control or authority over the operatives of the H. & T. C. who handled the messages pertaining to the receiver's road during the absence of the regular operator is wholly immaterial. The slightest reflection upon the scope and purpose of the act will satisfy any candid mind that the law is concerned, not with the method by which messages are accepted and received, but merely with the fact of prohibiting the employment at work for more than 13 hours of any operator at an office operated continuously night and day. If the contention of the defendant that the fact that for a part of the 24-hour period its messages were handled by persons employed not by itself, but by another company, makes the station a daytime station only, were sound, the act could be nullified throughout the length and breadth of the United States, wherever conditions of joint operation existed as at Navasota, by one company running its office 12 hours, the other 12 hours, and interchanging service with each other during the period that the respective operators hired by each were off duty.

Such a result, if reached by design, would not be tolerated; nor does the fact that the result is reached without design in any wise change the legal effect of the situation. What the law is concerned with in this case is not the method by which the receiver provides for the handling and transmission of his messages during the night hours, but with the fact that during some period of the 24 hours he obliges his operator to remain on duty more than 9 hours. What the precise nature of the arrangements the receiver made with the Houston & Texas Central was is wholly immaterial in this case, since the fact is undisputed that the receiver did have arrangements at the place, Navasota, for receiving messages day and night, and did for a part of the time at that place have an operator working more than 9 hours.

[2] Counsel for the defendant invokes the rule that penal statutes must be strictly construed. He misapprehends the nature and purpose of this act. This act, being highly remedial, should be liberally construed, and the fact that a penalty is provided for its violation does not change the rule. United States v. Kansas City Southern Ry. Co., 202 Fed. 828, 121 C. C. A. 136. The Supreme Court of the United States, in Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, discussing a closely analogous statute, the Safety Appliance Law (Act March 2, 1893, c. 196, 27 Stat. 531 [Comp. St. §§ 8605–8612]), says:

"The primary object of the act was to promote the public welfare by securing the safety of employés and travelers, and it was in that aspect remedial, while for violations a penalty of $100, recoverable in a civil action, was provided for, and in that aspect it was penal. But the design to give relief was more dominant than to inflict punishment, and the act might well be held to fall within the rule applicable to statutes to prevent fraud upon the revenue, and for the collection of customs; that rule not requiring absolute strictness of construction."

That the maintenance at a single place or station of separate buildings or local quarters for the receipt of telegrams does not operate to avoid a violation of the law is settled by numerous authorities, among them A. T. & S. F. v. United States, 236 Fed. 906, 150 C. C. A. 168; Illinois Central v. United States, 241 Fed. 667, 154 C. C. A. 425; G. R. & I. v. United States, 249 Fed. 648, 161 C. C. A. 556. By the same reasoning, the letting out of part of the work to an independent contractor would be of no avail.

[3] There is nothing in the record to show that the condition complained of exists by reason of an effort on the part of the receiver, by subterfuge, to defeat the purpose of the law, and in nothing that I have said have I meant to so hold. In a case of this kind, where the words "knowingly and willfully" are not employed, and the carrier is made liable if it requires or permits any employé to be or remain on duty in violation of statutory provisions, the fact of doing the thing prohibited by the statute constitutes the offense, although there is no turpitude nor wrong arising out of willfulness or special intent.

In the case of A., T. & S. F. v. United States, 236 Fed. 907, 150 C. C. A. 169, the evidence showed that the operation complained of in the action had not been instituted by the company after the taking effect of the Hours of Service Act, but had existed long prior thereto. The court said:

"This course of handling the business was adopted by the company for reasons of convenience, not to evade any law. It began before the passage of the Hours of Service Act. * * * And what could not be done as a new departure would be equally inadmissible as an old custom."

While it thus appears clear that the presence or absence of a specific intent to employ a subterfuge to violate the law is not material in determining the question of its violation vel non, it is equally clear that, in determining the amount of penalty which should be assessed therefor, specific intent should have just weight. Finding as I do a violation of the law through the doing of the act which the law forbids, without any evidence of the presence in the mind of the receiver of a specific intent to violate it, or that the method employed for the doing of the work was arrived at as a subterfuge, I shall, in finding for the United States, assess the minimum penalty upon each count.

The United States may therefore have judgment against the receiver for $100 on each of the 10 counts, or a total of $1,000.

### Stipulation.

Now come the plaintiff and the defendant in the above numbered and styled cause, by their respective attorneys, and in order to facilitate the trial thereof hereby stipulate and agree:

(1) That a jury may be, and is hereby expressly, waived.

(2) That this cause may be heard and determined by the court upon the following facts, which are agreed to be true in all particulars:

The defendant is, and was during the times mentioned in plaintiff's petition, the duly appointed and qualified receiver of the International & Great Northern Railway, a corporation organized and doing business under the laws of the state of Texas; said railway company being then and there a common carrier engaged in interstate commerce by railroad in said state.

During the year 1917 said defendant operated what is commonly known as the Ft. Worth Division of said railway company, extending from Spring, Tex., to Ft. Worth, Tex., a distance of approximately 272 miles. At Navasota, Grimes county, Tex., defendant maintained a certain telegraph office and station, at which was employed, in addition to the agent and helpers, one M. Menger, the telegraph operator and employé mentioned in said petition. The regular assigned hours of said Menger were from 7 a. m. to 6 p. m., with one hour off about noon for dinner, during which time (except the hour for dinner) he was regularly required to use the telegraph to report, transmit, receive, and deliver orders pertaining to and affecting the movements of trains engaged in interstate and intrastate commerce over said line of railroad. Said Menger was also required to remain on duty until 7 p. m. in the event that a train for which he had an order had not arrived at 6 p. m., in order to deliver the train order. No telegraphic service whatsoever was ever carried on in said station building between 7 p. m. and 7 a. m.

About 850 feet south of said station is located a building known as the H. & T. C.-Santa Fé tower, at which were employed three telegraph operators; said tower being operated continuously for 24 hours each day. Each of said operators worked a trick or shift of 8 consecutive hours. These operators were in the employ of the Houston & Texas Central Railroad Company, which line of railroad runs parallel to, and immediately adjoins, the line of the International & Great Northern Railway at Navasota.

In accordance with the terms of a certain contract in force in 1917, copy of which is attached hereto, marked Exhibit A, and made a part of this stipulation, all train orders issued between 6 p. m. and 6 a. m. for the movement of trains over defendant's line of railroad were issued by defendant's chief train dispatcher, located at Mart, Tex., and transmitted over the telegraph to said H. & T. C. operator on duty in said tower, who delivered same to the crews of the trains to whom they were directed.

Whenever Menger had an order for a train which failed to arrive by 7 p. m., he carried this order and delivered it to the H. & T. C. operator on duty in said tower; the latter would sign for same in defendant's transfer book, which Menger carried with him; the tower operator would thereafter deliver said order to the proper train crew, and then notify defendant's said train dispatcher at Mart that the order had been executed. Each morning before Menger went on duty at the station he would telephone said tower to see if any train orders remained undelivered; if so, he would go after them and sign for same in the transfer book, thereafter delivering same from the station in the usual manner.

On each of the days mentioned in plaintiff's petition defendant required and permitted the said Menger to be and remain on duty from 7 a. m. to 6 p. m., excepting during the noon hour for dinner, and while so on duty he was required to use the telegraph to report, transmit, receive, and deliver orders pertaining to and affecting the movements of trains engaged in interstate commerce over defendant's line of railroad. On two of the days in question orders were transferred and delivered in the manner set forth above, as shown by copies of the transfer book, attached hereto, marked Exhibits B, C, and D, and made a part of this stipulation. On October 20, 1917, Menger remained on duty until 7 p. m. on account of a train for which he had an order failing to arrive.

While Menger has been required to remain on duty until 7 p. m. in the event a train for which he had an order had not arrived at 6 p. m, in order to de-

liver the train order, this, however, has only occurred four or five times, as every effort has been made by defendant to avoid having any train orders outstanding at Navasota at 6 p. m. However, it was almost a daily occurrence for Menger to have transferred to him orders uncompleted or not delivered at 7 a. m.

The International & Great Northern Railway and its receiver, the defendant, have no jurisdiction or authority over the operation of the tower at Navasota, nor over the employés who work in the tower. Said railway, or its receiver, does not employ or pay the operators in the tower, nor has said railway or its receiver anything to do with the selection or discharge of said operators, but simply have a contract with the Houston & Texas Central Railway for the latter to perform certain telegraphic services for said International & Great Northern Railway during certain periods of the day, for which the latter railway and its receiver pay a stipulated consideration.

Menger received his telegraphic orders from said chief train dispatcher of the International & Great Northern Railway at Mart, Tex. D. E. Simmons, United States Attorney, Monroe C. List, Special Asst. to United States Attorney, Attorneys for Plaintiff. Wm. H. Wilson, Attorney for Defendant.

### Exhibit A.

### Contract No. 6406.

State of Texas, County of Harris.

This agreement, entered into this the 15th day of August, A. D. 1916, between the Houston & Texas Central Railroad Company, hereinafter styled Central Company, party of the first part, and the International & Great Northern Railway Company and James A. Baker, receiver, hereinafter styled International Company, party of the second part, witnesseth:

The Central and International Companies entered into contract with each other covering crossing and interlocker at Navasota, Tex., on October 23, 1901, and the Central Company and Gulf, Colorado & Santa Fé Railway Company likewise entered into contract for the construction and operation of an interlocker plant at Navasota, Tex., on October 1, 1903.

The Central Company has telegraph operators installed in the interlocking plant covered by contract between it and the Gulf, Colorado & Santa Fé Railway Company, but the service they render is only for the Central Company, and on date of this contract the International Company desires to have said operators serve it between the hours of 6 p. m. and 6 a. m. to handle its train movements during the nighttime between said hours; and

Whereas, it would be impractical for the Central Company to install such service in the interlocker covered by contract between the Central and International Companies, and desires to furnish such telegraphic service from the interlocker covered by contract with the Gulf, Colorado & Santa Fé Railway Company:

Now, therefore, the Central and International Companies hereby agree with each other that the Central Company shall furnish the International Company telegraphic service in the Gulf, Colorado & Santa Fé-Central Company interlocker between the hours of 6 p. m. and 6 a. m., and the International Company shall pay for such services fifty ($50.00) dollars per month. Either party may cancel this agreement, however, on thirty (30) days' written notice to the other, and after the termination of said period no further telegraphic service will be performed by the Central Company for the International Company, nor shall that company be required to make any payments for service rendered after such service has ceased.

Witness the signature of the parties hereto this the day and year first above written. Houston & Texas Central R. R. Co., by George McCormick, V. P. & G. M. The International & Great Northern Ry. Co., by A. G. Whittington, G. M., for Receiver.

Approved as to form: Baker, Botts, P. & G., General Attys.

Exhibit B.

International & Great Northern Railway Company,

James A. Baker, Receiver.

Navasota Station        Oct. 19th,        1917        Time 7 A. M.
The following train orders and messages are now outstanding:

| Train Orders. | | | | Messages. | |
|---|---|---|---|---|---|
| Form Nos. | | | | | |
| 19 | 31 | To Whom Addressed. | | No. | To Whom Addressed. |
| 4 | | No. 530 and all concerned | | 1 | N. G. R. |
| 5 | | Engine 126 | | | |

Signature of Operator Relieving: Menger.
Signature of Operator Relieved: ————.

Exhibit C.

International & Great Northern Railway Company,

James A. Baker, Receiver.

Navasota Station        Oct. 20th,        1917        Time  7 A. M.
The following train orders and messages are now outstanding:

| Train Orders. | | | | Messages. | |
|---|---|---|---|---|---|
| Form Nos. | | | | | |
| 19 | 31 | To Whom Addressed. | | No. | To Whom Addressed. |
| | 20 | All concerned. | | 1 | N. G. R. |

Signature of Operator Relieving: Menger.
Signature of Operator Relieved: Huff.

Exhibit D.

International & Great Northern Railway Company,

James A. Baker, Receiver.

Navasota Station        Oct. 20th,        1917        Time  7 P. M.
The following train orders and messages are now outstanding:

| Train Orders. | | | | Messages. | |
|---|---|---|---|---|---|
| Form Nos. | | | | | |
| 19 | 31 | To Whom Addressed. | | No. | To Whom Addressed. |
| | 20 | Conductor and Engineer | | | |
| | | No. 530 and all concerned. | | | |

Signature of Operator Relieving: Ross.
Signature of Operator Relieved: Menger.